[Cite as *In re Disinterment of Glass*, 2023-Ohio-3509.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

IN THE MATTER OF
THE DISINTERMENT OF
MARION J. GLASS, DECEASED
IRENE J. GLASS, DECEASED

:
:
:
:
:
:
:
:
:
:
:
:

C.A. Nos. 29700; 29707

Trial Court Case Nos. 2020 MSC
00382; 2020 MSC 00383

(Appeal from Common Pleas Court-
Probate Division)

. . . . . . . . . . .

O P I N I O N

Rendered on September 29, 2023

. . . . . . . . . . .

RICHARD A. TALDA and JOSHUA R. LOUNSBURY, Attorneys for Appellant, Kathleen Glass

AARON M. HERZIG, JULIA B. MEISTER, CHRISTOPHER M. WOLCOTT, ROBERT R. DUNLEVEY and GLEN R. MCMURRY, Attorneys for Appellees, Roger Glass Estate and Carol Pollock

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} In these consolidated cases, Kathleen Glass ("Kathleen") appeals from probate court judgments granting applications to disinter her parents, Marion and Irene

Glass.[1]  The appellees are Carol Pollock (Kathleen's sister) and Larry Mullins, Executor of the Estate of Roger Glass (collectively, "Applicants").   Roger Glass, Kathleen's brother and the original applicant for disinterment, died during the course of the litigation, and the court substituted Mullins as a party.

{¶ 2} According to Kathleen, the probate court erred in four ways: (1) by admitting evidence about settlement discussions; (2) by failing to find that Carol and Roger had waived their right to seek disinterment; (3) in granting the applications for disinterment; and (4) by denying Kathleen's motion to strike the Applicants' closing brief without holding an evidentiary hearing.   After considering the record, which included a four-day bench trial and many exhibits, we find no error on the court's part.   First, the court's admission of limited evidence about settlement discussions did not violate Evid.R. 408, which generally prohibits admission of such evidence.   However, evidence showing bias or motive is excluded from the rule.   Here, the factors used to assess disinterment applications require courts to consider the parties' motives and conduct.

{¶ 3} Furthermore, Kathleen waived objections to admission of evidence under Evid.R. 408.   Specifically, while Kathleen did challenge admission of settlement matters at various times during the trial, she had taken the opposite position before trial in response to Applicants' pretrial liminal motion.   She also had no issue with admitting such evidence when it was to her advantage, as in a post-trial motion she filed.   Kathleen only opposed admission when it was not to her benefit.

---

[1] An application was filed for each parent and the cases were consolidated.   Also, because several family members have the same last name, we will refer to the parties by their first names to avoid confusion.

{¶ 4} The probate court also correctly found that Applicants had not waived their right to seek disinterment, and the court did not abuse its discretion in granting the applications for disinterment. Seven factors are used to evaluate applications for disinterment. The court found that two factors related to the degree of relationship to the decedents were neutral (because the parties were all siblings). The court further found that the remaining five factors weighed either in favor of disinterment or heavily in its favor. The court's decision was supported by competent, credible evidence.

{¶ 5} Finally, the court did not abuse its discretion in denying Kathleen's motion to strike the Applicants' closing brief and in denying her alternative motion to reopen the proceedings and allow admission of new evidence. Kathleen alleged that Applicants had engaged in frivolous conduct by making false statements in their closing brief. She attempted to establish this by presenting evidence of attempts to compromise that had occurred during mediation and at one other point before trial. However, the court correctly noted that Kathleen had attempted to conceal such evidence during trial but then sought to use it to her benefit after trial. The court also correctly found that counsel have great latitude in closing argument, and that Applicants' closing brief did, in fact, discuss the evidence as it existed in the trial record.

{¶ 6} Finally, the court did not abuse its discretion in denying the motion to reopen. The court actually did consider the evidence that Kathleen wished to submit but found it was duplicative and unnecessary. Accordingly, all of Kathleen's assignments of error will be overruled, and the judgments of the probate court will be affirmed.

## I. Facts and Course of Proceedings

**{¶ 7}** On December 14, 2020, Roger Glass filed two applications for an order to disinter remains. One application (in Montgomery P.C. No. 2020-MSC-00382) concerned the remains of Roger's father, Marion J. Glass, who had died in March 2006. The other (in Montgomery P.C. No. 2020-MSC-00383) concerned the remains of Roger's mother, Irene J. Glass, who had died in January 2000. An attachment to the applications listed the next of kin as Roger, Carol (an Illinois resident), and Kathleen (a Florida resident), all of whom were siblings. Carol consented to the applications, but Kathleen objected. On April 22, 2021, the probate court consolidated the two cases.

**{¶ 8}** After that point, Calvary Cemetery Association of Dayton, Ohio ("Calvary") entered the case as a non-party for purposes of filing motions to quash a subpoena and a notice to take Civ.R. 30(B)(5) depositions of representatives of Calvary. Calvary was the cemetery in which Marion and Irene had been interred. After the court denied the motions to quash, Calvary appealed. Upon consideration, we found in early January 2022 that the court had not abused its discretion in denying the motion to quash. *See In re Disinterment of Glass*, 2d Dist. Montgomery No. 29160, 2022-Ohio-28, ¶ 66.

**{¶ 9}** While that part of the action was on appeal, the rest of the case proceeded in the probate court. For example, on July 27, 2021, the court filed an entry terminating mediation and noting that the case had not been settled. In September 2021, the court set trial for February 2022, and on October 27, 2021, the court granted a motion to realign Carol as an applicant. The court then ordered that Carol be designated as a co-applicant on the initial applications for disinterment.

{¶ 10} Subsequently, the court vacated the February 2022 trial date and reset the trial for August 9, 2022. The trial took place as scheduled, from August 9 through August 12, 2022. On August 15, 2022, the court filed an entry setting dates for filing post-trial briefs; the order allowed each party to file a brief within 14 days after written transcripts were made available. In addition, parties could file response briefs within 10 days after service of the post-trial brief. On August 26, 2022, the court filed an agreed entry which extended the briefing schedule. The parties were allowed until October 28, 2022, to file briefs, and until November 18, 2022, to file response briefs. The court then substituted Mullins as a party because Roger had died on August 24, 2022.

{¶ 11} Both sides filed closing briefs on October 28, 2022. At Kathleen's request, the court granted a further extension until December 16, 2022, to file response briefs. Subsequently, on December 13, 2022, Kathleen filed a motion to strike Applicants' closing brief or, alternatively, to reopen the evidence. Both sides then timely filed their response briefs. After receiving an extension of time, Applicants filed their response to the motion to strike on January 10, 2023, and a corrected response the following day.

{¶ 12} On January 17, 2023, the probate court filed a decision approving the applications for disinterment. The same day, the court denied the motion to strike. Kathleen then filed a notice of appeal from both decisions.

## II. Alleged Error in Admitting Evidence

{¶ 13} Kathleen's first assignment of error states that:

The Court Erred in Admitting Evidence Concerning Settlement

Negotiations.

{¶ 14} According to Kathleen, the probate court erred in admitting and considering evidence of settlement negotiations. In its decision approving the applications for disinterment, the court mentioned that the attorneys for Roger and Kathleen had communicated on October 29, 2020 (before litigation ensued). Decision, Order and Entry Approving Application for Disinterment (Jan. 17, 2023) ("Disinterment Decision"), p. 5-6. In discussing one of the factors that is weighed in considering whether to allow disinterment (conduct of the party seeking to prevent it), the court found Kathleen's conduct "nothing short of obstructive, heartless and damaging." *Id.* at p. 11. While discussing this point, the court referenced Kathleen's testimony in court in which "she finally admitted she may agree to sign the waiver for disinterment" under certain conditions. *Id.* at p. 12. After outlining these "conditions," the court stated, "Had Kathleen been sincere and had she timely made this demand in October or November 2020 when asked by Roger and counsel, the matter would have been resolved. Kathleen's delay and insincerity in all of her conduct forced Roger to continue design and construction without her participation." (Emphasis sic.) *Id.*

{¶ 15} Kathleen contends that the court's reliance on evidence about settlement (or lack of settlement) violated Evid.R. 408. This rule provides that;

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity

of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

{¶ 16} The exceptions to admitting evidence about settlement negotiations are not inclusive. "For example, this court has sustained a trial court's admission of settlement discussions offered to demonstrate the defendants' motives." *Hocker v. Hocker*, 171 Ohio App.3d 279, 2007-Ohio-1671, 870 N.E.2d 736, ¶ 32 (2d Dist.), citing *Schafer v. RMS Realty*, 138 Ohio App.3d 244, 295-296, 741 N.E.2d 155 (2d Dist.2000). *See also Hignite v. Trout*, 2d Dist. Greene No. 1988-CA-5, 1989 WL 43035, *14 (Apr. 28, 1989) (letter about settlement negotiations was properly admitted because its purpose was to show board of directors bore no malice in firing the plaintiff).

{¶ 17} Furthermore, "[w]here a statement is not made in the context of an offer of compromise, * * * it is not granted the protection of the exclusionary rule contained in Evid.R. 408." *USCA/USA, Inc. v. High Tech Packaging, Inc.*, 6th Dist. Wood No. WD-05-088, 2006-Ohio-6195, ¶ 34. Evid.R. 408 "only bars the admission of evidence when the evidence is offered to show 'that because a settlement offer was made, the offeror must be liable, because people don't offer to pay for things for which they are not liable.' "

*Boyle v. Daimler Chrysler Corp.*, 2d Dist. Clark No. 2001-CA-81, 2002-Ohio-4199, ¶ 95, quoting *In re Donahoe*, 180 B.R. 491 (Bankr. N.D. Ohio 1995). "In other words, Evid.R. 408 does not bar information from settlement negotiations when it is offered for another purpose and not to prove liability against one of the parties to the negotiations." *USCA/USA, Inc.* at ¶ 34.

{¶ 18} "Decisions involving the admissibility of evidence are reviewed under an abuse-of-discretion standard of review." *Estate of Johnson v. Randall Smith, Inc.*, 135 Ohio St.3d 440, 2013-Ohio-1507, 989 N.E.2d 35, ¶ 22. An abuse of discretion " 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " (Citations omitted.) *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). However, "most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). Decisions are unreasonable if they are not supported by a sound reasoning process. *Id.* The Supreme Court of Ohio has held it "axiomatic" that " '[n]o court - not a trial court, not an appellate court, nor even a supreme court - has the authority, within its discretion, to commit an error of law.' " *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 38, quoting *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, 932 N.E.2d 345, ¶ 26 (2d Dist.).

{¶ 19} After reviewing the record, we find no abuse of discretion by the probate court. As background, we note the following matters. At trial, the court heard testimony from the following people: Ricky Meade, Calvary's director; Neil Fogarty, the president of

Dodds Memorials ("Dodds"); Roger; Carol; and Kathleen.

{¶ 20} According to the testimony, Marion and Irene Glass were prominent members of the local community. They established Marion's Pizza in 1965 and, by 2006, the business had increased from two locations to seven. They accumulated wealth during their lifetimes and traveled quite a bit around the world. Transcript of Proceedings (Disinterment Trial) ("Tr."), 255-256.

{¶ 21} During their lives, Marion and Irene made generous gifts to their parish church, which included providing cash prizes for parish festivals, re-carpeting the church, replacing the organ, and donating $50,000. *Id.* at 250-251. After Irene's death, Marion funded stained-glass windows at St. Albert the Great church and at their Catholic church in Florida. Both windows bore Irene's name. In addition, Marion and Irene donated a reception area and at least two private rooms at the Hospice in Dayton, Ohio. These areas bore their names. *Id.* at 258-259. Marion also donated $500,000 to the Archdiocese of Cincinnati, for which he received recognition. *Id.* at 595.

{¶ 22} Irene was described as an elegant, well-dressed woman who drove a Mercedes automobile and lived in beautiful homes, including one in Dayton and an ocean-front condo in Florida. She also frequently wore jewelry. *Id.* at 254 and 256. Marion and Irene belonged to country clubs in Dayton and Florida and gave huge dinner dances at their country club. *Id.* at 255. Both parents' funerals were opulent, and after each funeral, a reception was held for hundreds of people at the Dayton County Club. *Id.* at 261.

{¶ 23} Before deciding on Calvary Cemetery, Marion and Irene looked at other

cemeteries. However, they chose Calvary because they were Catholic. Tr. at 361-362. Calvary was founded in 1872 as a Catholic not-for-profit association. The association is owned and is operated independently of the Archdiocese of Cincinnati. *Id.* at 52. From a religious aspect, the association recognizes the canons of the Catholic Church. *Id.* at 54. Calvary conducts disinterments about once a year, most of the time for relocation within the cemetery. *Id.* at 152.

**{¶ 24}** In 1979, Marion and Irene purchased eight in-ground burial plots in Section 36 of Calvary Cemetery. Irene objected because she did not want to be buried. However, at the time, Calvary did not have a public or community mausoleum available; this option did not become available until 1995. As of December 14, 1979, Marion, Irene, and Roger all had the right to be interred in one of four burial plots in the southeast corner of lot 117 of section 36. Other lots in that section were available for Kathleen and her husband, John McKay, and for Carol and her husband, James Pollock. *Id.* at 55, 58-59, 61, 362, 525, 532, and 630.

**{¶ 25}** At a later point, Marion and Irene transferred their burial rights in the four lots to Kathleen and arranged for a private estate mausoleum, which was a four-crypt unit. This was a stand-alone private mausoleum, and they acquired the rights for the ground in December 1988. *Id.* at 62, 64, and 123-124. Carol and John had also previously transferred their parcels to Kathleen. *Id.* at 60-63 and 541. Thus, including Kathleen's initial two units, Kathleen and John then had eight in-ground burial units available to them. *Id.* at 64.

**{¶ 26}** Calvary's executive director, Ricky Meade, was hired by Calvary in 1990 as

a superintendent; his title had changed to executive director in 2014. Tr. at 51. While private mausoleums and estate monuments are typically located on prominent corners on frontage lots, Meade's predecessors at Calvary used a military format, with everything in straight lines. Because private mausoleums and estate monuments would have disrupted the flow of modern maintenance, Meade's predecessors had selected a location for these structures in the far reaches of the back corner of the cemetery. That location was not attractive; it was bordered by a chain-link fence and barbed wire, as well as by power lines. When the Glasses purchased the land in 1988, there was no other choice of location for private mausoleums. *Id.* at 67, 69, 130, and 633.

{¶ 27} The Glasses' private mausoleum had four spaces and was about five to six feet wide and seven to eight feet deep. It was configured to have a concrete inner structure, which provided upper and lower levels, allowing for two caskets up and two down. *Id.* at 127-128. At this time, Kathleen still owned the eight in-ground burial plots. *Id.* at 66 and 632-633.

{¶ 28} In 1995, Calvary began constructing a public mausoleum called Stations of the Cross ("SoC"). *Id.* at 67. The restriction about where mausoleums could be placed was dissolved about two years after SoC was constructed. *Id.* at 134. As Calvary was constructing the SoC, it reached out to the two families, including the Glasses, who had private mausoleums in the unattractive area and gave them an opportunity to resettle their existing buildings in another location in the cemetery. Meade's understanding was that Irene and Marion were more interested in moving to the community mausoleum versus relocating the private mausoleum. *Id.* at 71. However, the section that Roger

obtained in 2020 for the new private mausoleum had not been opened yet and was not available.   *Id.* at 72.

{¶ 29} Marion and Irene exchanged their private mausoleum, and four spaces in the SoC mausoleum were conveyed to them on May 5, 1997.   At that time, Roger, Carol, and Kathleen were the listed heirs for the SoC spaces.   Tr. at 78-80 and Exs. 3 and 5. Irene died in 2000 and Marion died in 2006.   They were interred in two of the spaces in the SoC mausoleum, and two contiguous spaces remained vacant.   Tr. at 82 and 133-134.   Under Calvary's bylaws and under the Ohio Revised Code, cemetery spaces pass upon an acquiring owner's death on a "first come, first serve basis."   Where there is no designation, the next of kin has first rights to whatever space is available.   *Id.* at 77-78. Thus, while any one of the three siblings could have used the SoC spaces, there was room for only two siblings.

{¶ 30} After starting chemotherapy for a blood (cancer) disorder in June 2020, Roger began thinking about being buried with his father and mother.   *Id.* at 262 and 320. Roger was aware of the two available SoC spaces, but he thought the SoC was very impersonal.   He also wanted to honor his parents, who had been very honorable people and had been very respected and well-known in the community.   *Id.* at 263-264.   Roger assumed his sister, Carol, was going to be buried with her family in Chicago, as she did not live in Dayton.   He also assumed that his other sister, Kathleen, would be buried with her family, since she had three children.   Additionally, Kathleen lived in Florida and Michigan, not in Ohio.   *Id.* at 265-266.

{¶ 31} Roger went by himself to Calvary to find out if space was available or if he

was allowed to put a mausoleum anywhere. He did not talk to either sister before going. After Calvary indicated that space existed, Roger was told that they had to get permission from Roger's siblings. Meade explained Ohio legal requirements for disinterment to Roger, and Roger did not appear to have had any prior knowledge of them. *Id*. at 76. Roger was unaware of the permission requirement but did not anticipate any problems. *Id*. at 267-268. As noted, the location for the new mausoleum had not been available when Marion and Irene changed from their private mausoleum. *Id*. at 72.

{¶ 32} Roger and Carol talked frequently, and he told Carol of his desire, given his condition, to build a mausoleum for his parents. At that point, Carol said she thought she would like to be part of it. Consequently, while the original design was for three spaces, Roger enlarged it to eight spaces because he had nieces, nephews, and another sister. Tr. at 270-271. Roger talked to Carol about this before talking to Kathleen because he and Kathleen did not communicate often, i.e., they spoke only once a year at board meetings. In contrast, Roger usually talked to Carol about once a week. *Id*. at 272. The evidence at trial indicated that Roger and Carol had a close relationship, but they did not have the same relationship with Kathleen.

{¶ 33} The design and build work for the new Glass mausoleum ("GM") was coordinated through Dodds, which worked directly with Rock of Ages, a corporation located in Vermont. Dodds typically did the artwork, and the manufacturer did the actual fabrication of granite. *Id*. at 84 and 171-172. In early August 2020, the design for the GM was in its very initial concept. *Id*. at 175-176. At that point, Dodds and Roger were discussing birth and death dates to go with names on four statues, which were to be

located at the front of the building. The names at that time were Marion, Irene, Roger, and Carol. *Id.* at 176-177. However, nothing prevented the design from being changed. The design was not final, and Roger had not signed a contract with Dodds. *Id.* at 178 and 181.

{¶ 34} After finding out that he needed Kathleen's consent, Roger contacted her by email on October 20, 2020. At that time, they were developing the GM concept, but the plans could have been modified. *Id.* at 284-285 and 293-294, and Ex. 38. In the email, Roger explained what he wanted to do with the GM and that he needed Kathleen's and Carol's consent to move their parents. He further said he had contacted Carol and she had no objection, and that his attorney (Bob Dunlevey) would be sending forms to both sisters to sign. Roger asked Kathleen to email him concerning whether the form should be sent to her Michigan or Florida address and also said to call or email if she had questions. *Id.* at Ex. 38. Kathleen did not respond to the email. Tr. at 287 and 650.

{¶ 35} Before sending this email to Kathleen, Roger had sent it to Carol for her review. *Id.* at 593-594 and Ex. 55. On October 21, 2020, Carol called Kathleen and left a voice mail, discussing the fact that the mausoleum was their mother's wish and that she (Carol) was going to be involved. Carol's intent was to talk to Kathleen about joining her and Roger in the family crypt that Roger was planning to construct. Kathleen did not respond to this call. Tr. at 529-530 and 579. Instead of responding to her siblings, Kathleen called her business attorney, Sam Warwar. Warwar then asked Dunlevey to have Roger provide information about plans and specifications. *Id.* at 651-652.

{¶ 36} On October 29, 2020, Dunlevey emailed Warwar and indicated that Roger

would be sending tentative drawings to Kathleen. In addition, Dunlevey stressed that "time was of the essence." Exhibits(s) Respondent Trial Exhibits (Part 1 of 2), filed Dec. 21, 2022, Bates Stamp KGlass-000002. The same day, Roger emailed a sketch of the proposed mausoleum to Kathleen and to Warwar. Tr. at 295, 308-309, 330-331, and 652, and Exs. 39 and 56. In the email to Warwar, Roger noted that he and Carol had tried to contact Kathleen by phone and email, but she refused to return their calls or emails. Ex. 39, p. 2. Roger also stressed the personal urgency of his request. *Id.* Kathleen did not respond to the email. Tr. at 308. Responding on October 30, 2020, Warwar congratulated Roger on the mausoleum design, stating that "[i]t is a classic, handsome structure." Ex. 39 at p. 1. Warwar further stated that while Kathleen had seen the drawing and had given the matter serious consideration, "[u]nfortunately, Kathi cannot consent to your request." *Id.* No specific reasons were given. Evidence at trial suggested that Kathleen's refusal may have been motivated by business disagreements and sibling animosity. Tr. at 622-623.

{¶ 37} Dunlevey responded to Warwar on the same day, stating that "Roger does not understand the basis on which Kathi has made this decision and is most interested in knowing such." *See* Tr. at 356-359 and Ex E, p. 1. Dunlevey further said that if Kathleen needed more information about the plans and specifications, the information could be provided when it was developed. Dunlevey stated that the information was not in Roger's possession at that time and stressed that "Kathi is not being asked to defray the expense of the family mausoleum. If she wishes to have a crypt within the mausoleum, Roger is prepared to accommodate that under certain terms and conditions."

*Id.* The record does not contain any response to this email.

{¶ 38} On November 3, 2020, Roger wrote another email to Kathleen and copied both Warwar and Dunlevey. Roger attached a letter to the email. Tr. at 308-309, 499, and 500-501, and Ex. 57. In the letter, Roger explained his reasons for the disinterment request, including that his parents had reluctantly purchased space in the Calvary mausoleum (which Carol and their cousin could corroborate), his chemo treatments for a blood disorder, and the fact that, because he had no children, "it would be wonderful to construct a free-standing mausoleum near by [sic] that would be a fitting tribute to our family so that I could be interned [sic] with mom and dad." Ex. 57, p. 2. Roger further stated:

> Now, I am at a loss as to why you would refuse my request to have our parents reinterned [sic] in a mausoleum with me. You no longer live in Dayton and you at least have children who you can be buried with, so why would you care? Or, if you wish, I can add a space for you to be interned [sic] with me and mom and dad if you prefer.

Ex. 57 at p. 2.

{¶ 39} Again, Roger indicated that Kathleen could contact him if she had any questions. *Id.* She did not do so until November 19, 2020, when she wrote a short email, stating she was sorry about Roger's chemotherapy and that her parents' "wish to be entombed in the prevailing mausoleum was truly their last dying wish." Tr. at 501-502 and 671-672, and Ex. 43, p. 2. Kathleen did not mention Roger's offer to provide her with space of her own. Roger did not interpret this response as anything other than

an absolute "no." Tr. at 299. On November 25, 2020, Roger responded to Kathleen's email, disputing that being buried in the public mausoleum was Irene's dying wish, because Irene had died of a sudden heart attack. *Id.* at 324-326 and Ex. J.

**{¶ 40}** In the meantime, on November 4, 2020, Roger had purchased the ground (easement rights) for the GM at a cost of $278,775. Roger paid the entire purchase price himself. Tr. at 81-82 and 296-297, and Exs. 11, 41, and 42. The vacant spaces in the SoC were not sold back or exchanged, and no credit was applied to Roger's purchase of the land; instead, Calvary's director, Meade, believed a court would provide direction about what would occur with the remaining spaces. Those two spaces in the public mausoleum were available to any of the three Glass children, should they decide to be entombed there at no additional cost for the entombments. Absent an agreement among the children, it would be on a first come, first served basis. Tr. at 83 and 160-161.

**{¶ 41}** Kathleen wrote another email to Roger on December 1, 2020, stating that their mother had been happy with the SoC space and that their parents had liked to donate anonymously. She suggested that Roger donate money to non-profit organizations rather than build an expensive mausoleum. *Id.* at 311 and 501, and Ex. 59.

**{¶ 42}** On December 3, 2020, Roger wrote another email to Kathleen, asking what it would take to resolve the issue, "$5,000, 10,000, or what?" Roger asked for a figure, but Kathleen did not reply. According to Roger, he sent this because Kathleen was "known to like money" and he was kind of desperate, so he was making a last-ditch effort. Tr. at 304-305 and 479-480, and Ex. 44. Kathleen viewed these amounts as "insulting."

*Id.* at 481.   In this regard, she testified that "I think, to disturb my parents' remains is not something that money can pay for.   But if someone really was serious, you'd think they would offer a little bit more.   But there were no other things * * * offered to me."   *Id.* at 487.   As to what "other things" Kathleen was referencing, she said that Roger could have explained to her that the mausoleum was a family thing.   She also stated that if Roger had said he'd like for all of them to be in one mausoleum and honor their parents, she would have been willing to move the bodies in order to keep peace, even though she was opposed to it.   *Id.* at 489 and 497.[2]

{¶ 43} As indicated, the applications for disinterment were filed on December 14, 2020.   Oh December 17, 2020, Roger signed the contract with Dodds for the GM.   At that point, various modifications had been made to the design.   In fact, changes could be made at any time before construction began and did occur after the contract was signed.   *Id.* at 187, 192, 195, 198, 200-201, 203-205, 208-209 and 217.   Roger paid for half of the construction costs when he signed the contract.   The balance was later paid by Roger.   No one else paid for any part of the project.   *Id.* at 210-211.

{¶ 44} In late December 2020, Kathleen called Calvary Cemetery.   At Meade's request, the employee who dealt with Kathleen made a memo about the call.   According to the memo, the employee spoke with Kathleen on December 22, 2000.   Kathleen had called to request ownership information for Marion and Irene's spaces.   Kathleen also asked about a waiver that would allow her to be buried next to her Mother.   However, the employee informed Kathleen that no such record existed.   Kathleen did not believe her.

---

[2] These, in fact, are things Roger directly said by telling Kathleen he wanted to honor their parents and implied by offering her a space in the mausoleum.

On December 20, 2020, Kathleen had also sent an email to another Calvary employee, stating that she had had no idea that she owned the eight plots originally purchased by Marion and asking if she could sell them.[3] Subsequently, on December 24, 2020, Calvary sent Kathleen a full copy of the ownership file. Tr. at 88-92, 98, and 101-103, and Exs. 25, 26, and 27. Furthermore, it informed her that another family owned the crypt next to Irene; therefore, any adjacent crypt would be next to Marion. Tr. at 92-93 and 95, and Ex. 25.

{¶ 45} Construction of the GM did not begin until after the applications for disinterment were filed on December 14, 2020. In fact, the actual construction did not start until the end of June or the beginning of July 2022. At the time of trial, the mausoleum had been constructed and placed and had eight crypts available. Tr. at 153, 167, and 211-213. During the design process, no design was produced that did not include eight crypts. *Id.* at 195.

{¶ 46} With this background in mind, we will consider Kathleen's argument regarding the court's improper admission of evidence of settlement negotiations. According to Kathleen, the court improperly considered this evidence in reviewing three of seven factors used to evaluate whether an application for disinterment should be granted.

{¶ 47} Under R.C. 517.24(B)(1), a person who is not the decedent's surviving spouse may file an application in the probate court of the county in which the decedent is

---

[3] Kathleen's statement was contradicted by Calvary's records, which indicated that Marion, Irene, and Roger gave Kathleen and her husband permission to use four graves in June 1983. The records also stated that Kathleen retained the cemetery graves per her November 26, 2001 divorce decree. *See* Tr. 73 and Ex. 4.

buried, asking the court to issue an order for disinterment of the decedent's remains. In this situation, notice is given to various persons, including all persons who would have been entitled to inherit from the decedent under R.C. Chap 2105 if the decedent had died intestate. R.C. 517.24(B)(2)(a).[4]

{¶ 48} "Well-established public and legal policy has been that a person, once buried, should not be exhumed except for the most compelling reasons." *In re Disinterment of Frobose*,163 Ohio App.3d 739, 2005-Ohio-5025, 840 N.E.2d 249, ¶ 15 (6th Dist.), citing *Spanich v. Reichelderfer*, 90 Ohio App.3d 148, 628 N.E.2d 102 (2d Dist.1993). "This general policy is exemplified in the requirement that good cause for disinterment must be demonstrated before the probate court may issue an order for disinterment." *Jasper v. White*, 3d Dist. Marion No. 9-22-52, 2023-Ohio-2358, ¶ 25, citing former R.C. 517.24(B)(3)(a).[5]

---

[4] In its decision, the probate court noted that the governor had just signed S.B. 202, which would be effective April 3, 2023. The court stated that the bill's purpose was "to provide consistency between the disinterment statute[s] (R.C. 517.23 and R.C. 517.24) and right of disposition statute[s]," meaning the statutory scheme in R.C. 2108.70 through R.C. 2108.90. Disinterment Decision at p. 15. The court found the amendments would not impact the case before it. *Id.* at 16. After reviewing the amendments, which took effect after the court's decision and three years after the applications were filed, we agree. The legislation does not provide that it should be applied retroactively with respect to any section involved here. *See* Am. Sub. S.B. 202, 2022 Ohio Laws 152.

[5] The amendments effective in April 2023 removed the "good cause" requirement and the requirement that the court find a "compelling reason" for disinterment from R.C. 517.24. However, the amendments substituted a requirement that courts consider the provisions in R.C. 2108.82. *See* R.C. 517.24(B)(3)(a) (2023). R.C. 2108.82(B) contains factors that are consistent with ones courts have traditionally used to decide these issues. *Compare Frobose* at ¶ 16. R.C. 2108.82(C) further states, "There shall be no disinterment or other change of the original or last disposition unless the court makes a finding of compelling reasons based upon the factors listed in division (B) of this section." Therefore, analysis under the revised statute would not differ materially from the prior analysis. We also note that R.C. 2108.70 through 2108.90 (relating to final

{¶ 49} A hearing is not required if all persons who are entitled to be given notice consent to the disinterment. R.C. 517.24(B)(3)(b). When courts decide contested requests for disinterment, they apply a "flexible, multifactor-equitable standard." *In re Estate of Eisaman*, 2018-Ohio-1112, 110 N.E.3d 96, ¶ 13 (3d Dist.), citing *In re Disinterment of Swing*, 2014-Ohio-5454, 26 N.E.3d 827, ¶ 16 (6th Dist.). (Other citations omitted.)

{¶ 50} "These equitable factors include, but are not limited to (1) the degree of relationship that the party seeking reinterment bears to the decedent, (2) the degree of relationship that the party seeking to prevent reinterment bears to the decedent, (3) the desire of the decedent, (4) the conduct of the person seeking reinterment, especially as it may relate to the circumstances of the original interment, (5) the conduct of the person seeking to prevent reinterment, (6) the length of time that has elapsed since the original interment, and (7) the strength of the reasons offered both in favor of and in opposition to reinterment." *Frobose* at ¶ 16, summarizing *Spanich* at 152-155. (Other citation omitted.)

{¶ 51} According to Kathleen, the probate court's error occurred in relation to factors four, five, and seven, which the court found weighed heavily in favor of disinterment. Appellant's Brief, p. 17, and fn. 14. Kathleen's reply brief objects to several conclusions in the court's decision, including comments the court made about her conduct before litigation. In addition, Kathleen argues that the court elicited settlement

---

disposition of adult remains) were not effective until October 12, 2006, which was after Marion was interred on March 17, 2006. *See* Sub.H.B. 426, 2006 Ohio Laws 139 and Ex. 1.

discussion evidence from her during the hearing that turned out to match offers Kathleen conveyed to Roger and Carol before the 2021 mediation, and ten months later. Appellant's Reply Brief, p. 3.[6] Kathleen argues that no one would ever participate in settlement negotiations in disinterment cases if they could later be asked about statements made during those negotiations.

{¶ 52} Ironically, the parties have changed positions in that Kathleen was the party initially seeking to introduce evidence of settlement negotiations, and Applicants were the ones who asked the trial court to exclude this evidence. *See* Respondent Kathleen Glass' Pretrial Statement and attached Ex. A (List of Trial Exhibits), July 11, 2022; Applicants' Motion in Limine to Exclude Evidence of Compromise Negotiations, August 2, 2022; Respondent Kathleen Glass' Memorandum in Opposition to Applicants' Motion in Limine to Exclude Evidence of Compromise, August 8, 2022; and Tr. at 11-16 (discussing Respondent's Exs. B and E, pre-litigation emails between Kathleen's attorney and Roger's attorney).

{¶ 53} Kathleen's position in this regard was that no settlement negotiations were occurring at the time of the pre-litigation emails; they were just "conversations" between Kathleen and Roger. Tr. at 13. In addition, Kathleen argued that other statements Roger's attorney made had nothing to do with a settlement or a dispute. Included among such statements was a comment from Roger's attorney that "If she, meaning Kathleen * * * wishes to have a crypt within the mausoleum, Roger is prepared to accommodate

---

[6] The claim about matching offers is not based on evidence in the trial court record. Instead, it refers to evidence attached to Kathleen's motion to strike, which will be discussed later.

that under certain terms and conditions." *Id.* at 15-16.

{¶ 54} After considering the matter, the court overruled Roger's and Carol's liminal motion, subject to further objections. *Id.* at 16. As a result, Roger testified during direct and cross-examination about his pre-litigation emails with Kathleen, emails with Kathleen's attorney, and emails between his attorney and Kathleen's attorney (over his renewed objection). *See* Tr. 293-294, 295, 298-300, 304, 308, 311, 330, 331, 324-326, and 356-360, and Exs. 38, 39, 43, 44, 56, 57, 59, C, E, and J.

{¶ 55} During cross-examination, Kathleen's attorney asked Roger about Ex. E, which was an email from Roger's attorney to Kathleen's attorney. At that point, Roger's attorney objected, noting that "this was the subject of a prior motion in limine" and that "[t]he court was going to consider the question as the evidence was coming in." *Id.* at 356. A discussion then ensured, during which Kathleen's attorney argued that the questioning was intended to show that a "deception was being perpetrated on both Mr. Warwar and * * * Ms. Glass." *Id.* at 358. In contrast, Roger's attorney argued that "the context of this is that we had two lawyers understanding there was a dispute. There was a planned process and application for disinterment,* * * [s]o the lawsuit was not a maybe; it was a definite." *Id.* at 359. The court again overruled the objection to the extent it was based on Evid.R. 408 and allowed Kathleen's attorney to question Roger about statements his attorney made in the email, i.e., in Ex. E. *Id.* at 359-360.

{¶ 56} Further discussion of this issue occurred during Kathleen's testimony, when Roger's attorney tried to cross-examine Kathleen about her response to Roger's December 3, 2020 email, in which, as noted, Roger had offered to pay Kathleen an

amount of money that she found "insulting." Tr. 480-482 and Ex. 44. After Kathleen's attorney objected because this was "probably a settlement communication," the court stated that it believed some of the evidence should be admitted because the conduct of the parties was involved, particularly with consideration of factor seven (which involves "the strength of the reasons offered both in favor of and in opposition to reinterment." *Frobose*, 163 Ohio App.3d 739, 2005-Ohio-5025, 840 N.E.2d 249, at ¶ 16; Tr. at 482-483. After further discussion (which included the fact that Roger's counsel had previously discussed Ex. 44 without objection by opposing counsel), the court decided it would continue to consider these matters on a case-by-case basis. The court therefore allowed Roger's attorney to question Katherine about Roger's email. *Id.* at 483-485.

{¶ 57} During Carol's testimony, the subject of Evid.R. 408 arose again, when the court asked Carol questions about whether she ever found out if Kathleen would have participated in the mausoleum process after Carol called her (in October 2020). Tr. at 579-585. After discussion, the court stressed that it did not want to hear about statements made during mediation. *Id.* at 585. The court followed this by asking Carol about her opinion of what Kathleen's real objection to disinterment was and whether Carol felt Kathleen would have wanted to participate if she had seen the schematics with the four statues and names in August 2020. *Id.* at 586-587. Carol responded that she honestly did not know why Katherine objected and that she did not "understand why someone would not want to move their parents to a better place where we could all be buried together." *Id.* at 586. Carol also said that in her heart of hearts, she thought that Kathleen would maybe want to be with them, but maybe Kathleen did not want to settle.

*Id.* at 586-587.

**{¶ 58}** During her own case, Kathleen's attorney asked Kathleen about the email that Roger's attorney had sent to Kathleen's attorney on October 30, 2020 (Ex. E) and statements made in the email.   Tr. at 669-671.   Thus, during trial, Kathleen advocated for admission of settlement matters when it suited her and objected when she wished such evidence to be kept out of evidence.

**{¶ 59}** Kathleen also said in her pretrial statement that she intended to call Roger's attorney at trial to testify about communications he had had with her attorney "and associated documents."   Respondent Kathleen Glass' Pretrial Statement (July 11, 2022), p. 3.   And finally, the exhibit list attached to Kathleen's pretrial statement included all the pre-litigation emails between Roger and Kathleen; all such emails between Roger and Carol; Roger's email to Kathleen's attorney; and the email from Roger's attorney to Kathleen's attorney.   *See* Ex. A attached to Kathleen Glass Pretrial Statement, Items A, B, C, D, E, F, J, K, M, S, T, and QQQ (the last item being a January 23, 2020 email from Roger to Kathleen that was not identified or discussed at trial).

**{¶ 60}** In light of the above discussion, we conclude that Kathleen waived objections to admission of evidence under Evid.R. 408.   Specifically, while Kathleen did object to admission of evidence at various times during trial, she had no issue with admitting such evidence when it was to her advantage, both during trial and in responding to Applicants' pre-trial liminal motion.   However, Kathleen opposed admission when it was not to her benefit.   The law is well-established that "a party cannot be permitted to occupy inconsistent positions or to take a position in regard to a matter which is directly

contrary to or inconsistent with one previously assumed by him." (Citations omitted.) *Van Dyne v. Fid.-Phenix Ins. Co.*, 17 Ohio App.2d 116, 127, 244 N.E.2d 752 (7th Dist.1969).

**{¶ 61}** The quoted statement typically applies to parties who act in a particular manner before litigation is filed and then advocate for an inconsistent position during litigation. While the current situation does not fit neatly into that context, the principle rings true here, as it did in *Nationwide Ins. Co. v. Hall,* 7th Dist. Jefferson No. 1258, 1978 WL 214906 (Mar. 23, 1978). There, the court stressed that "[i]t is fundamental that a party cannot take inconsistent positions such as plaintiffs are attempting to do in this case by introducing evidence as to the death of defendant's sister and then objecting to defendant's doing the same thing." *Id.* at *3. At a minimum, Kathleen's inconsistent postures significantly detract from the force of her argument.

**{¶ 62}** Furthermore, even if waiver did not apply, the probate court did not abuse its discretion. In the first place, the parties tried the case to the court. In this situation, trial courts are presumed "to know the law." *Donofrio v. Whitman*, 191 Ohio App.3d 727, 2010-Ohio-6406, 947 N.E.2d 715, ¶ 46 (9th Dist.), citing *E. Cleveland v. Odetellah*, 91 Ohio App.3d 787, 794, 633 N.E.2d 1159 (8th Dist.1993). Trial courts are also presumed "to have considered only admissible evidence unless the record indicates otherwise." *White v. White*, 2d Dist. Clark No. 2013-CA-86, 2014-Ohio-1288, ¶ 11, citing *Cleveland v. Welms*, 169 Ohio App.3d 600, 2006-Ohio-6441, 863 N.E.2d 1125, ¶ 27 (8th Dist.).

**{¶ 63}** We also agree with the probate court that the evidence in question was not precluded by Evid.R. 408. As a preliminary point, none of the witnesses testified as to the content of the mediation proceedings or about statements made during mediation.

This was the only formal settlement negotiation that was conducted. Furthermore, disinterment cases are somewhat unique. Specifically, the factors outlined in deciding whether disinterment is allowed require courts to consider motive and conduct.

**{¶ 64}** For example, the seventh factor, "the strength of the reasons offered both in favor of and in opposition to reinterment," does consider motive, which can be expressed by statements, but is also often shown through an individual's conduct. *See Spanich*, 90 Ohio App.3d at 154-155, 628 N.E.2d 102 (noting that "[i]f the person seeking or opposing reinterment does so to harass another, his case will be very weak"). *See also Frobose*, 163 Ohio App.3d 739, 2005-Ohio-5025, 840 N.E.2d 249, at ¶ 24. In *Frobose*, the court considered the applicant's conduct *after filing her action for disinterment*, i.e., that shortly after the action was filed, the decedent's son "completely acquiesced to [the applicant's] demands," which removed her professed reasons for seeking disinterment. *Id.*

**{¶ 65}** In the case of *In re Estate of Eisaman*, 2018-Ohio-1112, 110 N.E.3d 96 (3d Dist.), a decedent's sister told his widow that she could not be buried beside her husband in the family plot because the deed had been given to a trust that precluded the widow from being buried there. As a result, the widow disinterred her husband's body and moved it to another cemetery. The decedent's sister then filed an application for disinterment, seeking to move the body back to the family plot. *Id.* at ¶ 1-5.

**{¶ 66}** During trial, the sister testified contradictorily that the deed transfer allowed the widow to be buried in the family plot and that she was not opposed to the widow's being buried there. *Id.* at ¶ 23. The trial court found that the sister's "testimony

concerning her change of heart was disingenuous" and "that her objection * * * softened only in the face of litigation." *Id.* The court of appeals concluded that competent, credible evidence supported these conclusions. *Id.* The court therefore considered the sister's pre- and post-litigation statements because they related to motive. Consequently, in the case before us, the probate court correctly found that Kathleen's comments before the action was filed, as well as her motives expressed through conduct in continuing to oppose disinterment, were relevant to its analysis.

**{¶ 67}** Accordingly, the first assignment of error is overruled.

### III. Waiver of Right to Seek Disinterment

**{¶ 68}** Kathleen's second assignment of error states that:

The Court Erred in Failing to Find that Applicants Waived Their Right

to Seek Disinterment.

**{¶ 69}** Under this assignment of error, Kathleen contends that Roger and Carol waived their right to seek disinterment because they had not objected to placement of their parents in the SoC and had failed to seek disinterment of Irene and Marion for about 20 and 16 years, respectively.

**{¶ 70}** As a preliminary point, we stress again that this case involved a bench trial. "When appellate courts review judgments following bench trials, a presumption applies that the trial court's findings are correct." *McNelly v. Conde*, 2021-Ohio-146, 166 N.E.3d 697, ¶ 18 (2d Dist.), citing *Fed. Ins. Co. v. Fredericks*, 2015-Ohio-694, 29 N.E.3d 313, ¶ 21 (2d Dist.). "Consequently, appellate courts may not substitute their judgment for

that of trial courts and must affirm judgments that are 'supported by some competent, credible evidence going to the essential elements of the case.' " *Id.*, quoting *State ex rel. Petro v. Gold*, 166 Ohio App.3d 371, 2006-Ohio-943, 850 N.E.2d 1218, ¶ 81 (10th Dist.). (Other citations omitted.)

**{¶ 71}** We also keep in mind that we must defer to the factfinder in bench trials. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). *Accord McNelly* at ¶ 19.

**{¶ 72}** R.C. 517.24 does not contain a statute of limitations, nor does it say anything about "waiver." The length of time is only one factor in assessing applications, and the circumstances in each disinterment case obviously differ. The fact that Roger and Carol waited for some time was not significant. As the probate court noted, when Marion died, only two spaces remained for the three children, and it "created a math problem that was not remedied until the construction of the Glass Family Mausoleum." Disinterment Decision at p. 4. While the court stated that the time lapse weighed against disinterment, it found the lapse understandable since the GM was not completed until July 2022 and was not an option when Marion and Irene were interred. *Id.* at 12-13. This is true. The court also stated that, because Roger had died in 2022, the GM would likely be permanent, and the court viewed "time periods of one or two decades as significant to one life, but not eternity." *Id.* at 13. The court's reasoning was not

unsound.

{¶ 73} The case Kathleen primarily relies on is *Spanich*, 90 Ohio App.3d 148, 628 N.E.2d 102, in which we found "substantial, relevant and probative evidence to support the trial court's conclusion that the appellant waived his rights to disinter his wife by failing to object to her place of burial for nearly two years." *Id.* at 156. However, the facts in *Spanich* were quite different from those involved here.

{¶ 74} Specifically, at the time of her death, the decedent and her husband had been separated for nearly two years, and she was living in her hometown. The reason for the separation was that the husband had forged the decedent's name on $40,000 in checks in Atlantic City, New Jersey, and had admitted he had a gambling problem. *Id.* at 150. Shortly before dying of blunt force trauma, the decedent had consulted an attorney about divorcing her husband. Her parents paid for the decedent's funeral and grave site, purchased two plots next to her, and paid for a monument that included their names as well as that of their daughter. *Id.*

{¶ 75} The husband filed exceptions to the inventory in the decedent's estate and also challenged some survivorship accounts that were in her name and that of her mother. Before that litigation was resolved, the husband contacted the cemetery about moving his wife's body to another grave. He denied during cross-examination that he was trying to blackmail his wife's parents "by threatening to disinter their daughter's body in order to obtain money from [them] to pay a $40,000 civil judgment emanating from the forgeries." *Id.* The probate court granted a permanent injunction against disinterment, stating that the husband " 'has not been motivated by love, honor, or respect for the deceased or her

parents. Quite the contrary, this court can only describe [his] conduct and attitude in this entire matter as egregious, greedy, and a gross infringement of any form of decency.' " *Id.* at 151, quoting the probate court's decision.

**{¶ 76}** After we considered the factors that were later summarized in *Frobose*, 163 Ohio App.3d 739, 2005-Ohio-5025, 840 N.E.2d 249, at ¶ 16, we found that substantial evidence supported the probate court's decision. *Id.* at 156.

**{¶ 77}** Having given proper deference to the probate court here, we find no error in its failure to find that Roger and Carol had waived their right to seek disinterment. As indicated, the facts in each case are unique, and courts have not found fault where the disinterment occurred a long time after the decedent was initially buried. *See Sencenbaugh v. Monclova Twp.*, 6th Dist. Lucas No. L-87-081, 1987 WL 19580 (Nov. 6, 1987) (rejecting complaint for wrongful disinterment and trespass where decedent's son disinterred him from an Ohio cemetery fifteen years after he had died and had moved him to a cemetery in North Carolina, where his wife was buried. The court noted that the son "did in fact fully comply with the statutory requirements of R.C. 517.23 and 517.24." *Id.* at *3). *See also Scott v. Spearman*, 115 Ohio App.3d 52, 54, 684 N.E.2d 708 (5th Dist.1996) (finding no action for wrongful disinterment where decedent's wife filed an application for disinterment and was allowed to move her husband's body more than 18 years after he was buried). Admittedly, these cases involve actions for wrongful disinterment, but they do indicate that the lapse of time here was neither unusual nor unprecedented. In any event, this is simply one factor in considering whether applications for disinterment should be granted.

{¶ 78} In her reply brief, Kathleen stresses our statement in *Spanich* that " '[w]aiver is a particularly appropriate principle to apply in the interpretation of the disinterment statute.' " Appellant's Reply Brief at p. 6, quoting *Spanich*, 90 Ohio App.3d at 156, 628 N.E.2d 102. However, we also emphasized in this context that "[t]he disinterment of the Spaniches' daughter would surely cause them to revisit the acute pain they must have felt upon her untimely death." *Id.* In contrast, both decedents here led prosperous, apparently happy, and long lives, Irene having died at age 84, and Marion having died at age 92. *See* Exs. 1 and 2. There was no indication that relocating their caskets to a nearby location in the same cemetery would cause anyone to revisit the acute pain of their deaths. Furthermore, *Spanich* involved a situation in which the conduct of the husband who wanted to disinter the decedent was so bad that the trial court found he could not even " 'be considered the surviving spouse as was intended under this statute [R.C. 517.23] for purposes of disinterment.' " *Spanich* at 151-152. That is not the case here. The evidence indicates that Roger and Carol desired to honor their parents.

{¶ 79} Based on the preceding discussion, the second assignment of error is overruled.

## IV. Granting the Applications for Disinterment

{¶ 80} Kathleen's third assignment of error states that:

The Court Erred in Granting the Applications for Disinterment.

{¶ 81} Under this assignment of error, Kathleen discusses the seven-factor test and argues that under her assessment of the facts, equitable considerations required

denial of the applications. As noted, these seven factors were outlined in *Frobose*, 163 Ohio App.3d 739, 2005-Ohio-5025, 840 N.E.2d 249, at ¶ 16. The probate court found the first two factors (degree of relationship of party seeking reinterment bears to the decedent, and degree of relationship of person seeking to prevent reinterment) were neutral, because all the parties bore the same relationship to their parents. Disinterment Decision at p. 8-9. Concerning the remaining factors, the court found factor three weighed in favor of disinterment, factors four, five, and seven weighed heavily in favor of disinterment, and factor six, while weighing against disinterment, was not significant. *Id.* at 9-15. We will discuss these matters briefly, since we have already mentioned many relevant facts while discussing the prior assignments of error.

## A. The Decedents' Desires

{¶ 82} The third factor is "the desire of the decedent." *Frobose* at ¶ 16. As noted, the probate court considered this factor as favoring disinterment, but did not weigh it as heavily as other factors. The court found that, in reality, one could only speculate what Marion and Irene wanted, since the GM did not exist when they were interred and they were limited in options when they purchased crypts in SoC. Disinterment Decision at p. 9. The court also stressed that in order to make the math work for the SoC, one child would have had to make a concession. *Id.*

{¶ 83} Furthermore, the court found that the GM was consistent with many of Irene's and Marion's desires, including being buried above ground, being in a Catholic cemetery, being very close to where they were originally interred, allowing Marion to be

next to Irene, and "permitting the entire family to be buried closer together, which appears to be what the decedents wished, from their purchase of eight burial plots and then four crypts." *Id.* Additionally, the court commented that Irene had not been happy with the aesthetics of the SoC but had little choice at the time, and that the elegant nature of the GM would correlate with Irene's lifestyle. *Id.* at 9-10.

**{¶ 84}** According to Kathleen, the court erred because Marion and Irene had had "options" and Irene had been especially interested in SoC. She further argues that her parents could have either moved their private mausoleum to a "more desirable location" or purchased spaces in the SoC, and they chose SoC. Appellant's Reply Brief at p. 8.

**{¶ 85}** First, the original private mausoleum's location in an unattractive area "helped create interest" for the new SoC location. Tr. at 67. This did not mean that the decedents were particularly enamored with the SoC. It is true that Marion and Irene had an option to relocate their mausoleum, but there is no evidence in the record that anything "more desirable" was available at that time; in fact, there is no description at all in the record of any other locations then available. *Id.* at 71-72. As indicated, the section where Roger located the GM was not available at the time. *Id.* at 72. There was testimony that the prior mausoleum was later sold to someone else and relocated to a more attractive location, but no time period was specified with respect to that transaction. *Id.* at 131.

**{¶ 86}** It is also true that Calvary's director said he had met with Marion and Irene in 1997 and that Irene had liked the SoC. *Id.* at 132. However, Carol testified that Irene had had a heart-attack in the middle of the night and that she (Carol) believed SoC was

a "stop-gap" measure so her parents would have somewhere to go. *Id.* at 539. This may have been the basis for the court's conclusion that Irene did not like the aesthetics of the SoC. The court did not cite a specific part of the transcript, but the court clearly found Roger and Carol credible and did not find Kathleen credible.

{¶ 87} Furthermore, the court was correct in every other respect. There was testimony that Irene wanted to be in a mausoleum above ground and wanted to be with her family, which included the three children and Marion. *Id.* at 532. This would not have been possible at the SoC because the SoC had only two remaining spaces for the children. And, as indicated, the court did not weigh this factor as heavily as the others, which was appropriate since one could only speculate as to the decedents' preferences. Clearly, Marion and Irene wanted a private mausoleum but did not have other good options when they chose interment in the SoC.

### B. Conduct of Person Seeking Reinterment

{¶ 88} The fourth factor is "the conduct of the person seeking reinterment, especially as it may relate to the circumstances of the original interment." *Frobose*, 163 Ohio App.3d 739, 2005-Ohio-5025, 840 N.E.2d 249, at ¶ 16.

{¶ 89} In this regard, the court acknowledged the presumption that the decedents would not wish for their remains to be disturbed but stressed that all three children could not be buried with their parents. Disinterment Decision at p. 10. The court further noted that Roger and Carol had no choice other than to bury Marion in the SoC in 2006, because no other mausoleum was then available, and Marion wished to be buried next to Irene.

The court therefore found their decision to bury Marion in the SoC had no bearing on the request to disinter. *Id.* at 11. These observations were consistent with the statement in *Spanich* that "the decedent's desire to be buried with his family may be a factor favoring reinterment, if that desire cannot be fulfilled in the place of original interment." *Spanich*, 90 Ohio App.3d at 153-154, 628 N.E.2d 102.

**{¶ 90}** In addition, the court emphasized that Roger invited both siblings to participate in the design and use of the GM and paid for it, but Kathleen chose not to participate, making Roger's conduct "pure," as demonstrated by his November 3, 2020 email (which offered Kathleen a space in the GM). *Id.*, citing Ex. 57.

**{¶ 91}** Kathleen argues that Roger was dishonest and tampered with an image he sent her. (Roger denied this, and there is no proof that he did so. *See* Tr. at 340-343 and 391-392, and Ex. 56.) Kathleen further contends that Roger sought to "trick" her into agreeing to disinter her parents to his mausoleum, "which exclude[d] her from the Glass family completely." Appellant's Brief at p. 22. As previously indicated, the court obviously did not find Kathleen credible and did find Roger and Carol credible. Again, we defer to a trial court's credibility decisions because the court had the best opportunity to see and hear witnesses. *Seasons Coal*, 10 Ohio St.3d at 80, 461 N.E.2d 1273.

**{¶ 92}** More importantly, there was uncontroverted evidence that Roger offered Kathleen a space in the new mausoleum – a fact that she inexplicably denied at trial. *See* Tr. at 500-501 and Ex. 57 (where, even after being presented with an email in which Roger offered her a space, Kathleen insisted that she thought the GM was only for Roger and their parents). Accordingly, the court's findings were supported by competent,

credible evidence, and the court did not err in weighing this factor heavily in favor of disinterment.

## C.  Conduct of Person Seeking to Prevent Disinterment

**{¶ 93}** The fifth factor is "the conduct of the person seeking to prevent reinterment." *Frobose*, 163 Ohio App.3d 739, 2005-Ohio-5025, 840 N.E.2d 249, at ¶ 16.  Concerning this factor, the probate court described Kathleen's conduct as "nothing short of obstructive, heartless, and damaging."  Disinterment Decision at p. 11.  In this vein, the court noted Kathleen's failure to respond to Roger "timely and reasonably" when he reached out in October 2020 or to respond to emails or calls from Roger and Carol.  *Id.* The court also referenced Kathleen's statement about cooperating if Roger had said he wanted a family mausoleum when he did just that, and it interpreted Kathleen's references to money as an indication that Kathleen was "never offered enough money" and that "this whole debate is just about money."  *Id.*

**{¶ 94}** Kathleen points to her testimony that disturbing her parents' remains was not worth any amount of money.   Appellant's Reply Brief at p. 23.   Clearly the court did not find this credible.   The court's decision was supported by competent, credible evidence.

**{¶ 95}** At trial, Kathleen claimed she was still waiting for "information" in November 2020 and also said several times that she was not aware the GM was to be a family mausoleum.   Tr. at 465, 489-490, 501-502, and 680.   This contradicted Kathleen's pre-litigation statement in an email to her attorney on October 29, 2020, concerning the fact

that Roger had approached her about a private mausoleum. Tr. at 620-623.[7] On October 29, 2020, Kathleen told her attorney that, "I'm positive they know exactly where everyone would be buried [in the GM], including Carol & her three darlings. Somehow, my gut feeling is that all of a sudden, things will get mixed up & there will be no room for me." *Id.* at 622.[8] These statements also contradict Kathleen's denial that Roger offered her a space in the GM. Tr. at 500-501 and Ex. 57. In light of Kathleen's contradiction of facts established by undisputed evidence, the court did not err in discounting her testimony.

**{¶ 96}** Kathleen also claims that the court improperly considered settlement matters in violation of Evid.R. 408. However, we have already rejected that argument.

**{¶ 97}** An additional argument that Kathleen makes is that by selling the two remaining SoC crypts back to Calvary, Roger removed her right to the space in the SoC. But the crypts were not sold back to Calvary. The contract between Roger and Calvary stated that:

> *Pending approved court order*, the fees will be waived for relocation
>
> of Marion & Irene Glass to the new mausoleum; a refund of $8900 will be
>
> authorized for the return of unused crypts (M1, Mausoleum 2, Crypt #5495,

---

[7] The parties stipulated at trial that this email had not been produced during discovery but had been disclosed during a grievance hearing against Roger's attorney, who waived confidentiality for purposes of the probate trial. Tr. at 620-622.

[8] This also contradicted Kathleen's trial testimony before the parties agreed to enter this material into evidence. Specifically, Kathleen had previously testified that she had no idea until April 2021 that her sister, Carol, would be buried in the mausoleum, did not express concern that Carol and her children had firmly committed spots in the mausoleum, and did not ever express concern about Carol and her children being in there. Tr. at 466-467.

5496).

(Emphasis added).   Ex. 11, p. 2.

**{¶ 98}** Consistent with the contract, Calvary's director, Meade, testified that no credit had been applied to Roger's $278,755 purchase (which had been paid in full), the two crypt spaces had not reverted to Calvary, and the spaces were still available to all three siblings.   Tr. at 80-83, 121, 139, and 296-297, and Exs. 11, 41, and 42.   According to Meade, whether a refund would be applied depended on whether the court authorized one or anything concerning the unused crypts.   Tr. at 141-142.   If the court did not order the refund, Calvary could not provide one, since the crypt spaces belonged to the three siblings.   *Id.* at 142.   Because the court did not provide for a refund or disposition in its decision, Kathleen has not lost access to these spaces.

**{¶ 99}** Based on the preceding discussion, the probate court's findings were supported by competent, credible evidence, and the court did not abuse its discretion in finding that Katherine's conduct weighed heavily in favor of disinterment.

### D.   Length of Time Since Original Interment

**{¶ 100}** The sixth factor concerns "the length of time that has elapsed since the original interment."   *Frobose*, 163 Ohio App.3d 739, 2005-Ohio-5025, 840 N.E.2d 249, at ¶ 16.   We have already considered this point and, for the reasons stated, find no abuse of discretion in the probate court's findings.

### E.   Strength of Reasons Offered For and Against Reinterment

{¶ 101} The seventh and final factor involves "the strength of the reasons offered both in favor of and in opposition to reinterment."   *Id.* at ¶ 16.   In this regard, the court described Kathleen as having "concocted numerous baffling and constantly evolving excuses as to why she would not participate in the Glass Family Museum and further, why she would not consent to the disinterment of her parents."   Disinterment Decision at p. 13.

{¶ 102} The court further found that Kathleen was "well-aware of how important" the mausoleum was to Roger, and that after Roger began to provide design information, Kathleen could have had time to negotiate a statue and participation if she had "responded timely and with any sincerity."   *Id.*   The court then described several instances where "Kathleen's reasons for refusing consent changed repeatedly."   *Id.* at p. 14.   These included Roger's excluding Kathleen (which was untrue); that her parents were not "pretentious," when in fact they had donated to charitable causes publicly and had not hid a lavish lifestyle; and religious objections which were later withdrawn and on which Kathleen provided no evidence.   In total, Kathleen crafted "whatever excuse appears to have occurred to her."   *Id.*

{¶ 103} In contrast, the court found that Roger and Carol had solved the "math" problem caused by only having two crypts and that Roger's November 3, 2020 email to Kathleen "exemplified his desperation, sincerity, frustration, insight, and desire."   *Id.* at p. 15.

{¶ 104} According to Kathleen, her objection never deviated: her objection was that disinterment was not what her parents wanted.   Appellant's Brief at p. 25.   However,

Kathleen did not point to evidence indicating this was her parents' position, and both Roger and Carol testified that Marion and Irene never stated that they did not want to be moved from the SoC. Tr. at 278 and 585. Carol also said she did not know why Kathleen objected to disinterment; in fact, her October 2020 call to Kathleen expressed that this was exactly what their parents wanted. *Id.* at 585.

{¶ 105} At trial, Kathleen related a story about the fact that her mother had been "thrilled" with SoC and that every time Kathleen's grown children came into town, her mother took them to the SoC and showed them the bench where they could sit and talk to her and pray. Tr. at 635. The court clearly did not believe this story.

{¶ 106} Our preceding discussion has mentioned a number of ways in which Kathleen's testimony contradicted established facts and her own testimony, all of which supported the court's conclusion that Kathleen gave baffling and changing reasons for her refusal to consent. Having reviewed the entire record, we find competent and credible evidence to support the court's decision to approve the applications for disinterment. Consequently, the third assignment of error is overruled.

## V. Denial of Motion to Strike

{¶ 107} Kathleen's fourth and final assignment of error states as follows:

The Court Erred in Denying Appellant's Motion to Strike Without Conducting an Evidentiary Hearing.

{¶ 108} Under this assignment of error, Kathleen argues that the court erred in denying her motion to strike portions of Applicants' closing brief or alternatively to reopen

the evidentiary hearing. According to Kathleen, the closing brief contained two material misrepresentations of fact about conditions for her consent to disinterment, and her motion had arguable merit, thus requiring a hearing. While Kathleen mentions Civ.R. 11 briefly, her argument focuses on R.C. 2323.51 (the frivolous conduct statute) and whether her claims had arguable merit such that the probate court erred in failing to conduct a hearing. We will therefore focus on R.C. 2323.51.

{¶ 109} As previously noted, after the trial had ended and the parties had submitted closing briefs, Kathleen filed a motion to strike Applicants' brief and alternatively sought to reopen the hearing to submit supplemental evidence. The first alleged misstatement concerned a condition for consent to which Kathleen testified at the hearing, i.e., that a space must be included for her niece, Meredith, and the Applicants' claim that Kathleen " 'never communicated this (or any other condition) to Roger or Carol before the hearing.' " Respondent Kathleen Glass' Motion to Strike Applicants' Closing Brief or, in the Alternative, to Reopen the Evidence (Dec. 13, 2022) ("Motion to Strike"), p. 4, quoting Applicants' Closing Brief at p. 13. The second alleged misstatement was that " 'Kathi's late-arrived-at conditions for consenting were only revealed at the hearing.' " *Id.*

{¶ 110} Despite her prior claim at trial that settlement offers were inadmissible under Evid.R. 408, Kathleen attached two settlement offers to her motion to strike. Both were in writing: one was dated May 14, 2021, and the other was dated February 7, 2022. Kathleen also included a June 20, 2022 letter from Applicants' counsel rejecting the last settlement demand. The May 14, 2021 document (Ex. A) was marked "settlement

communication subject to Evidence Rule 408" and referred to the order to mediate. The February 7, 2022 document (Ex. B) was similarly marked.

{¶ 111} After Roger and Carol replied to the motion to strike on January 10, 2023, the court denied the motion. *See* Decision, Order and Entry Denying Motion to Strike, or in the Alternative to Reopen the Evidence (January 17, 2023) ("Strike Decision"). In the decision, the court first noted that the documents Kathleen had attached were unauthenticated. *Id.* at p. 3. However, the court's decision to deny the motion was based on: (1) the fact that, during trial, Kathleen opposed all relevant evidence of attempts to settle or compromise under the guise of Evid.R. 408, when the rule did not apply; (2) no misrepresentations were made; and (3) there was no need to reopen the trial because the evidence was duplicative of evidence Kathleen provided at trial, and "reopening the case to present two otherwise irrelevant letters in rebuttal to a statement made in a closing brief is simply unnecessary." *Id.* at p. 3-6.

{¶ 112} With certain exceptions that do not apply here, R.C. 2323.51(B)(1) provides, in pertinent part, that "at any time not more than thirty days after the entry of final judgment in a civil action or appeal, any party adversely affected by frivolous conduct may file a motion for an award of court costs, reasonable attorney's fees, and other reasonable expenses incurred in connection with the civil action or appeal. The court may assess and make an award to any party to the civil action or appeal who was adversely affected by frivolous conduct, as provided in division (B)(4) of this section."

{¶ 113} In her motion, Kathleen alleged frivolous conduct under R.C. 2323.51(A)(2)(a)(iii) and (iv). Strike Motion at p. 3. This subdivision defines frivolous

conduct as conduct of a party to a civil action or of the party's counsel of record "that satisfies any of the following":

(iii) The conduct consists of allegations or other factual contentions that have no evidentiary support or, if specifically so identified, are not likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

(iv) The conduct consists of denials or factual contentions that are not warranted by the evidence or, if specifically so identified, are not reasonably based on a lack of information or belief.

{¶ 114} R.C. 2323.51(B)(2) allows courts to award fees, but only if the court sets a hearing, provides notice of the hearing, holds a hearing at which the parties are permitted to present evidence, and decides: (1) a party's conduct was frivolous; (2) a party was adversely affected; (3) the amount of fees to be awarded. *See* R.C. 2323.51(B)(2)(a), (b), and (c). Courts have held that "though R.C. 2323.51 requires a trial court to hold a hearing before it grants a motion for attorney fees, a hearing is not required when the court determines, upon consideration of the motion and in its discretion, that the motion lacks merit." *State ex rel. Delmonte v. Woodmere*, 8th Dist. Cuyahoga No. 86011, 2005-Ohio-6489, ¶ 54. *Accord Brock-Hadland v. Weeks*, 7th Dist. Mahoning No. 13 MA 170, 2015-Ohio-834, ¶ 9 ("[h]olding such a hearing when the court has already determined that there is no possible basis for the award would be a waste of judicial resources").

{¶ 115} Our district has said that "R.C. 2323.51 does not mandate that an

evidentiary hearing always be conducted to determine whether a particular action involves frivolous conduct, but it does require that if attorney fees are to be ultimately awarded, then a hearing indeed must be held in accordance with subsections (a), (b), and (c) of R.C. 2323.51(B)(2)." *Shields v. Englewood*, 172 Ohio App.3d 620, 2007-Ohio-3165, 876 N.E.2d 972, ¶ 50 (2d Dist.). Even where a hearing is held, it may be oral or on written materials. *Foland v. Englewood*, 2d Dist. Montgomery No. 22940, 2010-Ohio-1905, ¶ 31, citing *Shields* at ¶ 48. We have also discussed the issue of "arguable merit" in this context. *Classic Comfort Heating & Supply, LLC v. Miller*, 2d Dist. Darke No. 2021-CA-11, 2022-Ohio-855, ¶ 62, citing *Russell v. Ryan*, 2021-Ohio-2505, 175 N.E.3d 969, ¶ 15-16 (10th Dist.). No precise definition of arguable merit exists in this context, but in *Russell*, the court mentioned terms like "lack of a triable issue" and "no basis." *Id.*

**{¶ 116}** "The legal standard of review depends on whether a court is reviewing legal or factual decisions." *Horenstein, Nicholson & Blumenthal, L.P.A. v. Hilgeman*, 2d Dist. Montgomery No. 28581, 2021-Ohio-3049, ¶ 168, citing *Namenyi v. Tomasello*, 2d Dist. Greene No. 2013-CA-75, 2014-Ohio-4509, ¶ 19-20. Generally, "[w]e review lower court decisions on sanctions for abuse of discretion." *Payson v. Phipps*, 2d Dist. Miami No. 2021-CA-36, 2022-Ohio-1525, ¶ 67, citing S*tate ex rel. Striker v. Cline*, 130 Ohio St.3d 214, 2011-Ohio-5350, 957 N.E.2d 19, ¶ 11.

**{¶ 117}** "However, reviewing factual decisions 'involves some degree of deference, and we will not disturb a trial court's findings of fact where the record contains competent, credible evidence to support them.' " *Id.*, quoting *Shields,* 172 Ohio App.3d 620, 2007-Ohio-3165, 876 N.E.2d 972, at ¶ 54. Purely legal issues, like those involved

in deciding " ' "whether a pleading or argument is warranted under existing law or can be supported by a good faith argument for an extension, modification, or reversal of existing law," ' " are reviewed de novo. *Id.*, quoting *Natl. Check Bur. v. Patel*, 2d Dist. Montgomery No. 21051, 2005-Ohio-6679, ¶ 10. (Other citation omitted.) " 'The ultimate decision whether to impose sanctions for frivolous conduct, however, remains wholly within the trial court's discretion.' " *Id.*, quoting *Orbit Elecs., Inc. v. Helm Instrument Co.*, 167 Ohio App.3d 301, 2006-Ohio-2317, 855 N.E.2d 91, ¶ 47 (8th Dist.).

{¶ 118} As noted, "most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents.,* 50 Ohio St.3d at 161, 553 N.E.2d 597. "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

{¶ 119} After reviewing the record, we find no arguable merit to Kathleen's claims. The probate court therefore did not abuse its discretion in overruling the motion to strike and in rejecting the request to reopen the evidentiary hearing.

{¶ 120} As a preliminary point, the documents that Kathleen attached to the motion were not authenticated. According to Kathleen, the court made a decision before she had time to file a reply brief and remedy this error. However, Kathleen filed her motion on December 13, 2022, and the court did not issue its decision until more than a month later. As a result, Kathleen had ample opportunity to correct anything she wished. Nonetheless, the court did not rest its decision on this point.

{¶ 121} We also agree with the probate court that Kathleen should not be permitted to try to conceal evidence of attempts to compromise at trial and then rely on them when

it suits her purposes. Strike Decision at p. 4. As noted, Kathleen asserted prior to trial that she wanted to use evidence of emails between attorneys and opposed a motion in limine that sought to exclude those matters. Then at trial, Kathleen attempted to limit such evidence based on Evid. 408, but did not succeed. Subsequently, after closing briefs had been filed, Kathleen then contradicted her trial position and sought to add this type of evidence to the record. Ultimately, this was fatal to the motion to strike because it demonstrated an inconsistent pattern of conduct during the litigation.

{¶ 122} The court also found that the Applicants had not misrepresented facts to the court. In this vein, the court stressed the great latitude afforded in closing arguments. *Id.* at 5. This is correct. The Supreme Court of Ohio has acknowledged that "counsel should be afforded great latitude in closing argument * * * and that the determination of whether the bounds of permissible argument have been exceeded is, in the first instance, a discretionary function to be performed by the trial court." (Citations omitted.) *Pesek v. Univ. Neurologists Assn., Inc.,* 87 Ohio St.3d 495, 501, 721 N.E.2d 1011 (2000). Moreover, as we noted, in bench trials, courts are presumed to know the law and are presumed to consider only admissible evidence. *Donofrio,* 191 Ohio App.3d 727, 2010-Ohio-6406, 947 N.E.2d 715, at ¶ 46, and *White,* 2d Dist. Clark No. 2013-CA-86, 2014-Ohio-1288, at ¶ 11.

{¶ 123} Further, we agree with the probate court's decision. There is no question that this was a fiercely-fought case with animosity between opposing parties. In fact, the Applicants' reply to Kathleen's closing brief also alleged various ways in which Kathleen had misrepresented facts and referenced facts not in evidence or that were outside the

record.  *See* Applicants' Closing Reply (Dec. 16, 2022), p. 2, 3-6, 7, 8, and 9 (referencing and detailing Kathleen's "misrepresentations of the evidence"; stating that "Kathleen misrepresents facts and relies on 'facts not in evidence' " and asking to strike the evidence; claiming that "Kathleen argues based on inferences not supported by the record at trial"; and stating that Kathleen "creates the misleading impression" and "weaves a revisionist tale").  The only difference between the Applicants and Kathleen in this context was that Applicants did not file a motion to strike asserting frivolous conduct.

{¶ 124} The Applicants' closing brief did reference the record but was overzealous in stating that Kathleen had never communicated a condition about her niece being entombed in the Glass mausoleum or any other conditions to Roger and Carol before the hearing, and in stating that Kathleen's "late-arrived at conditions were only revealed at the hearing."  Applicants' Closing Brief (Oct. 28, 2022), p. 13.  These statements were technically true based on the evidence presented at the hearing.

{¶ 125} However, if one considers the unauthenticated attachments to the motion to strike, Kathleen did mention her niece in a mediation letter and did later, in February 2022, send an offer with some conditions.  Applicants' statements could have been better phrased, but in fact, the court did prohibit testimony about mediation or actual offers, and facts regarding these matters were not in the trial record.   Tr. at 482-485, 579, and 585.   Therefore, the Applicants accurately stated the trial record as it existed. Based on the circumstances here, which include intense advocacy on both sides, the court correctly found no basis for the motion to strike.

{¶ 126} Kathleen has only briefly mentioned her alternative motion to reopen the

evidentiary hearing. In this regard, she argues that the court should have reopened the hearing to admit evidence of the settlement offers. Appellant's Brief at p. 29 and fn. 18, citing Evid.R. 611(A).

**{¶ 127}** "Trial courts are given great deference in controlling their dockets, and therefore, a reviewing court uses an abuse of discretion standard when reviewing a trial court's requirements in this area." *Mathewson v. Mathewson*, 2d Dist. Greene No. 2005-CA-35, 2007-Ohio-574, ¶ 26, citing *State v. Unger*, 67 Ohio St.2d 65, 67, 423 N.E.2d 1078 (1981). Evid.R. 611(A) further provides that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."

**{¶ 128}** Typically, this rule is applied where a court restricts the time length of a proceeding, or restricts witness questioning, or allegedly shows judicial bias in conducting a trial. *E.g., In re T.H.,* 192 Ohio App.3d 201, 2011-Ohio-248, 948 N.E.2d 524, ¶ 39 (2d Dist.); *Franks v. Rankin*, 10th Dist. Franklin No. 11AP-934, 2012-Ohio-1920, ¶ 49; *Rick's Foreign Exchange Co. v. Greenlee*, 2d Dist. Montgomery No. 26096, 2014-Ohio-4505, ¶ 27-29. However, courts have allowed parties to reopen their cases after resting in order to introduce further evidence. Again, the decision is reviewed for abuse of discretion. *Positron Energy Resources, Inc. v. Weckbacher*, 4th Dist. Washington No. 07CA59, 2009-Ohio-1208, ¶ 20.

**{¶ 129}** Given the limited number of cases we found in which reopening has been

approved, this situation does not occur frequently. The procedure also seems particularly inappropriate when, as here, a case has been pending for a significant period of time and the parties were allowed all the time they needed to try the case.

**{¶ 130}** Nonetheless, the court did not err in this regard. In fact, while the court denied Kathleen's motion, it did consider the attached documents. The court noted the content was "was not entirely different than the reasons [Kathleen] provided at trial for refusing to consent – in other words, the evidence was already taken into consideration – not for offers of compromise but rather substantively under *Frobose*." Strike Decision at p. 5-6. This is true. Thus, while the court denied the motion to reopen, the court actually did consider the exhibits Kathleen submitted. However, the court found them duplicative of the evidence Kathleen had already provided at trial. *Id.* at p. 7. Again, our review of the record indicates that the court was correct.

**{¶ 131}** Accordingly, the probate court did not abuse its discretion in denying Kathleen's motion to strike, and the fourth assignment of error is overruled.

VI.   Conclusion

**{¶ 132}** All of Kathleen's assignments of error having been overruled, the judgments of the probate court are affirmed.

. . . . . . . . . . . . .

EPLEY, J. and LEWIS, J., concur.